NO. COA13-601

NORTH CAROLINA COURT OF APPEALS

Filed: 1 April 2014

JEFF ROLAN[1]; MATTHEW COLE ROLAN,
Minor, by WILLIAM S. MILLS as
Guardian *Ad Litem*; MATTHEW
BALDWIN, Minor, by SIDNEY S.
EAGLES, JR., as Guardian *Ad Litem*
and TIMOTHY BALDWIN and KELLIE
BALDWIN; ISABEL SEVERA, Minor, by
SIDNEY S. EAGLES, JR.[,] as
Guardian *Ad Litem* and KATHLEEN
SEVERA; WILLIAM SHY, Minor, by
SIDNEY S. EAGLES, JR., as Guardian
*Ad Litem* and TODD SHY and JENNIFER
SHY; SCOTT VENABLE, Minor, by
SIDNEY S. EAGLES, JR.[,] as
Guardian *Ad Litem* and WILLIAM
VENABLE and SUSAN VENABLE; CARTER
CHURCH, Minor, by SIDNEY S.
EAGLES, JR.[,] as Guardian *Ad
Litem* and CHAD CHURCH and AMANDA
CHURCH; LUKE CHAUVIN, Minor, by
SIDNEY S. EAGLES, JR., as Guardian
*Ad Litem* and KEITH CHAUVIN and
JENNIFER CHAUVIN; CHAD ENNIS,
Minor, by SIDNEY S. EAGLES, JR.,
as Guardian *Ad Litem* and JAYSON
ENNIS and WENDY ENNIS; KATHLEEN
MANESS, Minor, by SIDNEY S.
EAGLES, JR.[,] as Guardian *Ad
Litem* and MICHAEL MANESS and
REBECCA MANESS; CARSON MCGEE,
Minor, by SIDNEY S. EAGLES, JR.,
as Guardian *Ad Litem* and MIKE
MCGEE and VICKIE MCGEE; TERRA
PERRIGO, Minor, by SIDNEY S.

---

[1] The parties' briefs list "Matthew Baldwin" as the named party
in this case. Pursuant to the custom and practice of this Court,
however, we use the name first listed in the caption of the
order being appealed.

EAGLES, JR.[,] as Guardian *Ad Litem* and TERRY PERRIGO and LAURA PERRIGO; CAMERON CHAUVIN, Minor, by SIDNEY S. EAGLES, JR.[,] as Guardian *Ad Litem* and KEITH CHAUVIN and JENNIFER CHAUVIN; AEDIN GRAY, Minor, by WILLIAM W. PLYLER as Guardian *Ad Litem*; KYLE GRAY; ELIZABETH GRAY; and REECE C. BUFFALOE, Minor, by WADE H. PASCHAL, JR.[,] as Guardian *Ad Litem*,

    Plaintiffs,

    v.

N.C. DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES,
    Defendant.

North Carolina
Industrial Commission
I.C. Nos. TA-20317-18, 20327-37, 20369-71, 20779.

Appeal by Plaintiffs from Decision and Order filed 4 January 2013 by the North Carolina Industrial Commission. Heard in the Court of Appeals 7 November 2013.

> *Roberts & Stevens, P.A., by Mark C. Kurdys and Robin A. Seelbach; Kirby & Holt, Inc., by William B. Bystrynski and David F. Kirby; Pulley Watson King & Lischer, P.A., by Charles F. Carpenter and Guy Crabtree; Moody, Williams & Roper, by C. Todd Roper; and Marler Clark, LLP, PS, by William D. Marler, for Plaintiffs.*

> *Attorney General Roy Cooper, by Associate Attorney General Christopher McLennan; and North Carolina Department of Agriculture and Consumer Services, by Tina L. Hlabse, for Defendant.*

STEPHENS, Judge.

*Factual Background and Procedural History*

This case arises from an *Escherichia coli* O157:H7 ("*E. coli*") outbreak linked by the North Carolina Department of Health and Human Services and the Centers for Disease Control to a petting zoo operated during the 2004 North Carolina State Fair ("the Fair"). *E. coli* is a bacterium that can cause potentially life-threatening illness in humans. Children under five years old are especially at risk. Exposure to the bacterium can result from "eating contaminated meat or leafy greens, exposure to contaminated water, or through contact" with the feces of animals carrying the bacteria in their intestinal tract. Animals carrying the disease "can look perfectly healthy and still be shedding the *E. coli*[] bacteria in their stool," and transmission can occur "when people pet, touch, or are licked by animals." Over 800,000 people visited the Fair in October of 2004. Of those 800,000 people, an estimated 20,000 visited the petting zoo, and approximately 108 contracted *E. coli*.

Among the people who contracted *E. coli*, a number of minor children ("Plaintiffs") were found to be infected. As a result, Plaintiffs filed claims for damages against Defendant North Carolina Department of Agriculture and Consumer Services under

the North Carolina Tort Claims Act. Those claims were eventually consolidated into a single action, and Plaintiffs submitted a joint motion for partial summary judgment on the issue of liability to the North Carolina Industrial Commission ("the Commission") on 5 November 2010. Plaintiffs' motion was denied by order filed 20 July 2011. Following a hearing on the merits, a deputy commissioner entered a decision denying Plaintiffs' claims. Plaintiffs appealed to the full Commission, and, following a hearing on Plaintiffs' appeal, the Commission entered a Decision and Order denying all of Plaintiffs' claims.

In its Decision and Order, the Commission found the following pertinent facts: In preparation for the Fair, Defendant employed a number of veterinarians and other professionals who worked to ensure the health and safety of Fair patrons. A pre-fair risk assessment revealed that, while "hand washing stations were strategically positioned in or near the petting zoo[,] . . . there was an almost complete absence of signs warning people to wash their hands after contacting animals . . . ." As a result, one of the veterinarians put up additional signage and hand sanitizers before the Fair opened. Testimony and exhibits presented before the Commission indicate

that there were a number of signs at the petting zoo during the Fair.

Structurally, the petting zoo

> consisted of a 40 foot by 60 foot open tent with a 10[-]foot-wide gate area at the front. At the center of the front gate was a 4[-]foot-wide area covered by a large, wooden sign that contained the petting zoo rules, including rules against smoking, eating[,] or drinking inside the petting zoo. On either side of that sign were 3[-]foot-wide gates, with the one on the right being the entrance to the petting zoo, and the one on the left being where patrons would exit from the petting zoo. Fair patrons standing outside the petting zoo could see inside and would know that they were entering an area with sheep and goats roaming about on a bed of wood shavings. At the back of the tent there were separate pens containing animals that were too large to be roaming among small children. At the entrance to the petting zoo, there were two hand sanitizing dispensers, and immediately outside the exit gate, there were three more hand sanitizing dispensers. In addition, [a building containing] 8 permanent bathrooms with soap and water facilities[] was immediately across the street from the petting zoo, and there was another building with 4 bathrooms and soap and water facilities across from the petting zoo . . . .
>
> . . . In addition to the zoo rules sign located at the entrance to the petting zoo, there were approximately 5 signs taped to the side of the tent above the feed machines which said, in English and in Spanish, "ALWAYS WASH HANDS *BEFORE AND AFTER* TOUCHING ANIMALS IN ORDER TO PROTECT THEM AND YOU."

> [The owner of the petting zoo also] posted a sign . . . on the exit gate which read, "REMEMBER . . . wash hands after petting animals." [Moreover, t]here were . . . hand washing signs posted beneath the hand sanitizing dispensers, which [the owner] recalled having [an image of two hands being washed]. The sign was laminated and done on paper reflecting that it was issued by [Defendant]. The sign states "Hand to Mouth contact after touching animals or their environment is a health risk! Always Wash hands Before and After Touching Animals in Order to Protect Them and You!" At the bottom of that sign[] additional information was provided regarding high risk individuals, washing hands with soap and water before eating and before and after touching animals and their environment, and avoiding hand[-]to[-]mouth activities in the livestock areas, such as eating, smoking[,] and nail biting. . . . [S]igns warning patrons to wash their hands were posted inside the petting zoo and at the petting zoo exit, and . . . the more detailed signage . . . was posted at the bottom of the hand sanitizing stations outside the entrance and exit to the zoo.

(Italics added). There were also a number of people working at the petting zoo who monitored the people entering and exiting, removed feces, and "replace[d] the soiled wood shavings with clean wood shavings." Some parents recalled seeing the signs and others did not. "Many parents testified that it was very crowded inside the petting zoo and that their children were knocked down by goats and sheep trying to get food." At oral argument, Plaintiffs' counsel referred to the zoo as a "free for all."

Field veterinarian Dr. Carol Woodlief, Defendant's main point of contact on the ground, testified that she and the other field veterinarians were aware of and took steps to protect against a number of diseases, including *salmonella*, campylobacter, coccidiosis, sore mouth, ringworm, and *E. coli*. Dr. Woodlief noted, however, that "*E. coli*[] was not 'any bigger on her mind' than any of the other potential diseases" in 2004. The field veterinarians "made sure that every animal arriving at the Fair had the requisite health certificate . . . ." They also "observed the animals to make sure there were no obvious signs of illness" and "physically handled animals to check for lumps or anything that would suggest sore mouth or ringworm . . . ." Animals showing signs of disease were pulled. Field veterinarians also "continued to observe all of the animals throughout the duration of the . . . Fair."

Given the above facts, the Commission concluded that the precautions taken by Defendant were sufficient to meet its duty of care. Specifically, the Commission stated that:

> 5. . . . [T]hose responsible for conducting the 2004 . . . Fair exercised reasonable care to keep its premises in a reasonably safe condition for lawful visitors. Further, the evidence demonstrates that the . . . Fair was conducted well within the industry standards at that time. The primary recommendations of all concerned groups and

publications, *i.e.,* hand washing or hand sanitizing stations, separation of food and beverages from contact areas, and signage advising that a health risk exists and that hand washing is recommended, were fulfilled at the . . . Fair[] in accordance with then-existing nationwide industry standards, which did not require that handouts and signage include information regarding the potential severity of the health risk. Moreover, the practices in place at the . . . Fair were identical to or better than those that had been utilized at prior [state fairs in North Carolina], none of which had produced documented cases of *E. coli*[] infection resulting from human[-]to[-]animal contact.

6. In the absence of evidence that [Defendant's] employees knew or had reason to know that the animals in the [petting zoo] were actively shedding *E. coli*[] during the 2004 . . . Fair (as contrasted with their knowledge that ruminants have the potential to shed *E. coli*[]), the . . . Commission concludes that [Defendant's] employees were not negligent in failing to warn fair patrons of a hidden hazard. Given the presence of pathogens in our environment, the inability to completely eliminate enteric pathogens if human[-to-]animal contact is going to be permitted, and the precautions they had in place to reduce and minimize the risk, [Defendant's] employees were not negligent with respect to their duty to warn or their duty to exercise reasonable care to keep the premises safe for lawful visitors.

(Citations and internal quotation marks omitted; italics added).

In coming to that conclusion, the Commission focused on the fact

that — in 2004 — the danger of *E. coli* infection at state fairs

was "still an emerging issue" throughout the country. According to reports published in the months before the Fair, few states had written guidelines on zoonotic disease or the connection between zoonotic diseases and animal exhibits. With the goal of reducing the risks of disease transmission, certain reports recommended the use of informational signage; hand sanitizer or hand washing stations with running water, soap, and disposable towels; human-to-animal contact supervision; regular removal of animal feces; and the prevention of eating and drinking in human-to-animal-contact areas.[2]

Given its conclusions, the Commission denied Plaintiffs' claims for damages. Commissioner Bernadine S. Ballance dissented from the Commission's decision on grounds that Defendant's pertinent employees — "all [d]octors of [v]eterinary [m]edicine" — "knew or reasonably should have known that *E. coli*[] was a hidden danger and posed a substantial risk of serious illness and death [to the young children who visited the petting zoo]"

---

[2] One report noted that "the only way to eliminate the risk of zoonotic transmissions is to completely prevent interaction between animals and humans at animal exhibits." Recognizing that such an option "might not be feasible or desirable," however, the report suggested the above strategies for minimizing exposure.

and failed to adequately warn the Fair's patrons of that danger. Plaintiffs appealed the Decision and Order of the Commission.

*Standard of Review*

"The standard of review for an appeal from the . . . Commission's decision under the Tort Claims Act shall be for errors of law only under the same terms and conditions as govern appeals in ordinary civil actions, and the findings of fact of the Commission shall be conclusive if there is any competent evidence to support them." *Simmons v. Columbus Cnty. Bd. of Educ.*, 171 N.C. App. 725, 727, 615 S.E.2d 69, 72 (2005) (citation and internal quotation marks omitted). "Moreover, findings of fact which are left unchallenged by the parties on appeal are presumed to be supported by competent evidence and are, thus[,] conclusively established on appeal." *Kee v. Caromont Health, Inc.*, 209 N.C. App. 193, 195, 706 S.E.2d 781, 782–83 (2011) (citation and internal quotation marks omitted). "The Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433–34, 144 S.E.2d 272, 274 (1965).

*Discussion*

On appeal, Plaintiffs assert that the Commission's decision should be reversed because its conclusions of law are not supported by its findings of fact. More specifically, Plaintiffs contend that: (1) the Commission's findings of fact 32 and 33 are, in part, conclusions of law and, therefore, should not be analyzed under our deferential competent evidence standard[3]; (2) the Commission applied an incorrect standard of care, which "led the Commission . . . to the erroneous conclusion that [Defendant] was not negligent in this case"; and (3) the Commission erred in concluding that Plaintiff's injuries were not proximately caused by Defendant's negligence because the parties had already stipulated to this fact. We affirm the Commission's Decision and Order.

*I. Findings of Fact 32 and 33*

In pertinent part, findings of fact 32 and 33 read as follows:

> 32. [T]he operators of the 2004 . . . Fair . . . exercised reasonable care in [their] respective duties to keep the [fairgrounds, including the petting zoo], in a safe condition for its lawful visitors.

---

[3] Plaintiffs do not dispute the validity of the Commission's other findings of fact. Therefore, those findings are presumed to be supported by competent evidence and conclusively established on appeal. *Kee*, 209 N.C. App. at 195, 706 S.E.2d at 782–83.

Regardless of whether the measures [taken] were done in response to the [reports published prior to the Fair], and regardless of whether there was strict compliance with all recommendations [made therein], the . . . Commission finds that the evidence of record establishes that [Defendant] carried out [its] respective duties with reasonable care to minimize and hopefully eliminate the risk that fair patrons who attended the [petting zoo] would contract *E. coli*[]. The signage [Defendant] used and the hand washing protocols [it] relied upon, in conjunction with [its] observation and monitoring of activities inside the petting zoo, including constant removal of fecal material by employees of the petting zoo, were in keeping with the usual and customary conduct and practices of other state fairs in 2004 under similar circumstances. The specific training that plaintiffs suggest should have been given . . . had not been developed or implemented by other state fairs in 2004, when *E. coli*[] was an emerging public health issue. The failure of any of [Defendant's] employees to give . . . specific zoonotic disease training, as opposed to . . . general discussions regarding the need to protect the public from the spread of disease from animals to humans, did not . . . constitute a failure to exercise reasonable care for the safety of the fair patrons [in 2004]. The . . . Commission finds that it was reasonable on the part of [Defendant's] employees to believe that the practices that were in place at the 2004 . . . Fair were sufficient to provide adequate protection for [f]air patrons against the transmission of zoonotic diseases. Plaintiffs have failed to prove that they contracted *E. coli*[] as a result of failure on the part of [Defendant's] employees to exercise due care for their safety.

33. With regard to [Defendant's] duty to warn fair patrons of unsafe conditions, the . . . Commission finds . . . that [Defendant] exercised reasonable care to provide warnings at the [petting zoo] that contact with the animals posed a health risk. The . . . Commission finds that [the] signage used by [Defendant's] employees in 2004 was sufficient to warn petting zoo patrons of a possible health risk and sufficient to advise them of what precautions they should observe, particularly given the fact that none of the . . . employees knew or could have determined in the exercise of due diligence that any of the animals in the petting zoo were actively shedding *E. coli*[] during the . . . Fair. The . . . Commission finds that a reasonable person exercising due care for the safety of fair patrons in 2004 was not required to provide handouts or signage describing the potential severity of the health risk, which had never surfaced before at the . . . Fair, given the precautions that were in place at the time to prevent the spread of zoonotic disease.

On appeal, Plaintiffs contend that these "findings" are more properly labeled mixed findings of fact and conclusions of law because they find facts and make legal determinations based on those findings. Therefore, Plaintiffs assert, we must not accord findings 32 and 33 "the same deference as true findings of fact on appeal." Defendant does not contest this point in its brief, merely noting that mixed findings of fact and conclusions of law are nonetheless reviewable by this Court and pointing out

that "the *factual portion* of these mixed [findings]" should still be reviewed under the competent evidence standard. (Emphasis added). We agree.

With regard to mixed questions of law and fact, the factual findings of the Commission are conclusive on appeal if supported by any competent evidence. *Davis v. Columbus Cnty. Schs.*, 175 N.C. App. 95, 100, 622 S.E.2d 671, 675 (2005). As with separate findings of fact and conclusions of law, the factual elements of a mixed finding must be supported by competent evidence, and the legal elements must, in turn, be supported by the facts. *See Horn v. Sandhill Furniture Co.*, 245 N.C. 173, 177, 95 S.E.2d 521, 524 (1956) (reviewing the Commission's mixed finding and concluding that "[t]he specific facts found are insufficient to sustain the conclusion that the injury resulting in death arose out of and in the course of the employment"); *see also Beach v. McLean*, 219 N.C. 521, 525, 14 S.E.2d 515, 518 (1941) ("If [a finding of fact] is a mixed question of fact and law, it is likewise conclusive, provided there is sufficient evidence to sustain the element of fact involved.").

Therefore, findings of fact 32 and 33 are conclusive as to their factual elements if supported by competent evidence and reviewable *de novo* as to their legal elements. Here, though

Plaintiffs have elected to remind us of the distinction between a finding of fact and a conclusion of law, they fail to challenge either the factual or legal elements of findings 32 and 33 as not based on competent evidence or not supporting the conclusions. Instead, they merely note in their second argument, discussed *infra*, that the Commission committed reversible error by employing an incorrect statement of the law. Therefore, we need not review the specific elements of findings 32 and 33 or engage in an analysis of whether those elements are "factual" or "legal." *See generally Helfrich v. Coca-Cola Bottling Co. Consol.*, __ N.C. App. __, __, 741 S.E.2d 408, 412 (2013) ("Findings of fact which are left unchallenged by the parties on appeal are presumed to be supported by competent evidence and are, thus[,] conclusively established on appeal.") (citations, internal quotation marks, and brackets omitted); N.C.R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned."). Plaintiffs must contest these findings in order to take advantage of the relevant standards of review and has not done so here. Accordingly, we proceed to Plaintiffs' premises liability argument.

*II. Premises Liability*

*1. Appellate Review*

In their second argument on appeal, Plaintiffs contest the validity of the Commission's conclusion that Defendant did not breach its duty of care on grounds that the conclusion is based on an incorrect standard of care. Plaintiffs go on to argue that Defendant failed to act with due care under the correct standard. In response, Defendant contends that Plaintiffs are barred from challenging the standard of care applied by the Commission because they did not raise this issue before the Commission. We disagree.

As a general rule, a party may not make one argument on an issue at the trial level and then make a new and different argument as to that same issue on appeal. *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934) ("An examination of the record discloses that the cause was not tried upon that theory, and the law does not permit parties to swap horses between courts in order to get a better mount [on appeal]."). The rationale behind this rule is twofold. First, principles of fairness to both parties do not permit one party to use the appellate system to advance a new or different argument than it employed at trial simply because that party did not properly prepare or was unable to think of the argument below. *See id.* Second, as required by the process of preserving an issue for

appellate review, the contention argued on appeal must have been raised, argued, and ruled on in the trial court. *See Wood v. Weldon*, 160 N.C. App. 697, 699, 586 S.E.2d 801, 803 (2003) (citing the "swap horses" rule and the rule requiring the preservation of issues for appellate review for the same point), *disc. review denied*, 358 N.C. 550, 600 S.E.2d 469 (2004). Therefore, it is implicit within the rule that a party must have actually been able to raise an argument before the trial court in order for it to be barred as impermissible "horse swapping." *See Weil*, 207 N.C. at 10, 175 S.E. at 838; *see also Wood*, 160 N.C. App. at 699, 586 S.E.2d at 803. Accordingly, arguments limited to alleged errors of law made for the first time in the trial court's written opinion cannot be deemed improper simply because those arguments were never made before the trial court. *Cf. Carden v. Owle Constr., LLC*, __ N.C. App. __, __, 720 S.E.2d 825, 827 (2012) ("A trial court's conclusions of law are fully reviewable on appeal.") (citation, internal quotation marks, and ellipsis omitted). That is to say, the appealing party cannot be charged with impermissibly *swapping* horses when it never mounted one in the first place.

Here, as discussed above, Plaintiffs are not contesting a statement or application of the law made by the Commission

*during* the hearing. Rather, Plaintiffs contest the Commission's articulation and application of the law *in its Decision and Order*. As it would be impossible for Plaintiffs to challenge the legal principle articulated by the Commission before it was actually stated, Plaintiffs cannot be barred by the "swap horses" doctrine in this case. To hold otherwise would be to require a party to anticipate a court's opinion before it is written, and we decline to require such foresight here. Accordingly, Defendant's preliminary argument is overruled, and we proceed to Plaintiffs' second argument on appeal.

*2. Standard of Care*

Plaintiffs' second argument contains two elements. First, Plaintiffs contend that the Commission applied an incorrect legal standard in reaching its conclusions of law on the duty of care owed by Defendant to the Fair patrons. Second, Plaintiffs contend that the Commission erred in concluding that Defendant did not violate its duty of care. We are unpersuaded on both counts.

In order to prove a defendant's negligence in a premises liability case, the plaintiff must first show that the defendant either "(1) negligently created the condition causing the injury, or (2) negligently failed to correct the condition after

actual or constructive notice of its existence." *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 64, 414 S.E.2d 339, 342–43 (1992). "The ultimate issue which must be decided in evaluating the merits of a premises liability claim[, however,] is . . . whether [the defendant] breached the duty to exercise reasonable care in the maintenance of [its] premises for the protection of lawful visitors." *Burnham v. S&L Sawmill, Inc.*, __ N.C. App. __, __, 749 S.E.2d 75, 80 (citation and internal quotation marks omitted), *disc. review denied*, __ N.C. __, 752 S.E.2d 474 (2013).

> Reasonable care requires that the landowner not unnecessarily expose a lawful visitor to danger and give warning of hidden hazards of which the landowner has express or implied knowledge. This duty includes an obligation to exercise reasonable care with regards to reasonably foreseeable injury by an animal. However, premises liability and failure to warn of hidden dangers are claims based on a true negligence standard which focuses . . . attention upon the pertinent issue of whether the landowner acted as a reasonable person would under the circumstances.

*Thomas v. Weddle*, 167 N.C. App. 283, 290, 605 S.E.2d 244, 248–49 (2004) (citations, internal quotation marks, and certain ellipses omitted). Reasonable care does not require "owners and occupiers of land to undergo unwarranted burdens in maintaining their premises." *Royal v. Armstrong*, 136 N.C. App. 465, 469, 524

S.E.2d 600, 602, *disc. review denied*, 351 N.C. 474, 543 S.E.2d 495 (2000).

*A. Created Harm*

Plaintiffs first contend that the Commission erred by relying solely on the rule that landowners "have a duty to exercise reasonable care so as not to unnecessarily expose lawful visitors to danger and to warn them of hidden hazards of which the landowner has express or implied knowledge." Plaintiffs assert that the standard used by the Commission is incorrect because Plaintiffs were not required to show that Defendant knew or should have known about the danger of *E. coli* where, as here, Defendant "*created* the condition causing [the] injury." (Emphasis in original). Therefore, Plaintiffs assert that we must remand to the Commission for proper application of the correct standard of care. This argument is misplaced.

Plaintiffs' argument assumes that the Commission's decision turns on whether Plaintiffs adequately established that Defendant knew or should have known about the risk of *E. coli*. This is incorrect. Defendant *admittedly* knew there was some risk of an *E. coli* infection by operating a petting zoo at the Fair. Indeed, Dr. Woodlief testified during the hearing that she was concerned about the possibility of a number of diseases,

*including E. coli.* The fact that the Commission did not acknowledge that negligence could be proven by showing that Defendant either created the harm or had express or implied knowledge of the harm has no effect on the resolution of this case. The relevant question is whether Defendant exercised due care in October of 2004 to protect Fair patrons against *E. coli* infection and, in doing so, adequately fulfilled its duty to warn those patrons of the risk of harm. Accordingly, the omission described above cannot constitute reversible error, and Plaintiffs' argument is overruled. *See Vaughn v. N.C. Dep't of Human Res.*, 37 N.C. App. 86, 90, 245 S.E.2d 892, 894 (1978) ("We will not reverse the order of the Commission for harmless error. To warrant reversal, the error must be material and prejudicial.") (citation omitted).

*B. Reasonable Care Under the Circumstances*

Second, Plaintiffs contend that Defendant failed to meet its duty of care because the petting zoo unreasonably exposed lawful visitors to "a significantly increased risk of contracting a potentially deadly bacteria . . . ." In order to satisfactorily minimize that risk, Plaintiffs suggest that Defendant should have done all or some of the following: provide better supervision, put up a fence between the children and the

animals, require parents to carry or hold hands with small children in order to reduce the likelihood of falling, refrain from allowing or offering food in the zoo, and provide more detailed information to Fair patrons about the *specific* danger of *E. coli* infection. Plaintiffs contend that Defendant's failure to take such precautions was a deviation from its duty of care because Defendant (1) was "charged with the responsibility to minimize and prevent the transmission of diseases from animals to humans at the . . . Fair," (2) "conducted its own assessments of the risks for disease transmission at the . . . [f]airs in 2002 and 2004," (3) "developed and issued its own recommendations toward reducing that risk," and (4) had "the latest and best available information and recommendations" regarding zoonotic diseases. We do not find Plaintiffs' position persuasive.

As Defendant notes in its brief, the precautions taken by Fair officials must be viewed in light of what a reasonable person would have done in October of 2004 to protect against the danger of *E. coli*. *See Thomas*, 167 N.C. App. at 290, 605 S.E.2d at 248–49. In 2004, *E. coli* was considered to be an "emerging public health issue." Only one state had legislation addressing the disease in the context of petting zoos, and "there were no

federal laws or regulations in 2004 prohibiting petting zoo exhibits or preventing people from intermingling directly with animals at petting zoo exhibits." No evidence was presented at the hearing that an *E. coli* outbreak had occurred at the Fair prior to 2004, and the petting zoo had been an exhibit at the Fair for the past three years — in 2001, 2002, and 2003 — without an illness-related incident.

In addition, a doctor hired in 2005 by the International Association of Fairs and Expositions[4] to train fair officials to prepare for the danger of *E. coli* in human-to-animal contact settings testified that "most fairs allowed people to intermingle with animals, despite the risk of *E. coli*[] transmission." Having visited fifteen to twenty fairs each year, the doctor observed that signs used by other fairs in 2004 did not list "specific zoonotic factors or describ[e] the specific zoonotic risk, or severity of risk." Rather, the signs "primarily focused on suggesting that patrons wash their hands." Regarding enteric pathogens like *E. coli*, the doctor had previously commented that:

> We do not live in a pathogen-free environment. . . . [T]here is no known process or system to completely eliminate

---

[4] The Fair is associated with this organization.

the risk associated with enteric pathogens. Pathogens are part of our world[,] and we must continue to manage our environment such that risk is reduced and consumers are protected as effectively as possible.

The doctor testified that, even by August of 2011, he did not see fairs listing *specific* zoonotic risks on signs.

Despite the inherent difficulty in eliminating the risk that comes from enteric pathogens, officials at the 2004 Fair participated in a "pre-fair risk assessment." This assessment was designed to "identify and correct any deficiencies prior to the opening of the Fair." According to the Commission, the "concerns raised in the . . . [pre-fair risk assessment report] regarding signage and hand washing stations were adequately and appropriately addressed prior to the opening of the 2004 . . . Fair." In addressing those concerns, officials erected additional signage and hand sanitizing stations at and near the petting zoo. The signs indicated that individuals visiting the zoo should wash their hands before and after touching the animals. Though the signs did not specifically mention *E. coli*, this omission was not atypical for fairs at that time.

While it was certainly *possible* for Defendant to take the additional precautions suggested by Plaintiffs, we agree with the Commission's conclusion that Defendant did not fail to act

with due care in October of 2004 to minimize the risk of exposure to *E. coli*. Sources cited by the Commission note that it is impossible to eliminate the risk of enteric pathogens, like *E. coli*, in human-to-animal contact settings without eliminating petting zoos altogether. While sparing the children and animals from this "free for all" would have been the safer option by all accounts, Defendant's decision not to do so was not a breach of its duty of care. Petting zoos were lawful in 2004, and the Commission's findings make clear that the precautions taken by Defendant were well within the range of acceptable care for such zoos.

Our premises liability law does not require landowners to *eliminate* the risk of harm to lawful visitors on their property or undergo unwarranted burdens in maintaining their premises. We conclude that the Commission correctly determined that Defendant took reasonable steps in 2004 to appropriately *reduce* the inherent risks of operating a petting zoo. While such steps might not be sufficient to do so today, especially given the 2004 outbreak, Plaintiffs' suggested precautions go beyond the reasonable standard of care required of a landowner in October of 2004. To hold otherwise would be to engage in the type of Monday-morning quarterbacking that the law of negligence should

avoid, and we decline to do so here. Accordingly, Plaintiffs' second argument is overruled.

### 3. Proximate Cause

Lastly, Plaintiffs argue that the Commission erred in finding of fact 32 by stating that Plaintiffs' injuries were not proximately caused by Defendant's negligence, in contravention to the parties' stipulations and the undisputed evidence presented at the hearing. This argument is based on a misreading of finding of fact 32.

As discussed above, finding of fact 32 states in pertinent part that "Plaintiffs have failed to prove that they contracted *E. coli*[] as a result of failure on the part of [Defendant's] employees to exercise due care for their safety." This finding is not relevant to the issue of proximate cause. Rather, it addresses whether Defendant acted with "due care." Plaintiffs' interpretation of the Commission's use of the words "as a result of" transmogrifies the Commission's statement into something other than what it is. Accordingly, Plaintiffs' third argument is overruled, and the Commission's Decision and Order is

AFFIRMED.

Judges ERVIN and DILLON concur.